Joseph Bumby Hardware Company v. Commissioner.
Joseph Bumby Hardware Co. v. Commissioner
Docket No. 29092.
United States Tax Court
1953 Tax Ct. Memo LEXIS 226; 12 T.C.M. (CCH) 604; T.C.M. (RIA) 53191; May 29, 1953
*226 George W. Ericksen, Esq., Box 1531, Tampa, Fla., for the petitioner. William W. Oliver, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiencies in income tax and declared value excess-profits tax against the petitioner for the fiscal year ended June 30, 1943, in the respective amounts of $4,829.44 and $1,678.27; and a deficiency in excess profits tax for the fiscal year ended June 30, 1944, in the amount of $12,747.91. The issues to be decided are (1) whether the petitioner is entitled to a deduction in the amount of $15,348.82 in excess of the amount allowed by the respondent for debts becoming worthless during the fiscal year ended June 30, 1941, and (2) whether the petitioner is entitled to a deduction in the amount of $2,886.52 in excess of the amount allowed by the respondent for debts becoming worthless during the fiscal year ended June 30, 1942. The fiscal years ended June 30, 1941 and June 30, 1942, are involved by reason of claimed net operating loss carry-overs. The parties have agreed that one-half of certain other bad debts in the amount of $832.10 claimed in the taxable years *227 1942 and 1943 became worthless in those years and are deductible as such. Findings of Fact Some of the facts have been stipulated and are found as stipulated. The petitioner is a corporation engaged in the hardware business with its principal office in Orlando, Florida. Its returns for the periods herein were filed with the collector for the district of Florida. Issue No. 1. Harry E. Bumby. When petitioner was incorporated in 1917 the shares of the corporation's capital stock were distributed among the heirs of Mrs. Joseph Bumby, one-ninth of the total shares to each of her children, one of whom was Harry E. Bumby. All of the stock of petitioner was owned within the Bumby family group, all of the board of directors were members of the Bumby family, and A. W. Bumby, Harry's brother, was president of the petitioner from its incorporation in 1917 through 1949. Harry started to work with the corporation about that time, and was employed continuously by the petitioner until his death on April 11, 1941. He continued to be a stockholder until on or about October 18, 1932, at which time he assigned all of his shares of stock in petitioner to his wife. From that time until his death *228 he was not a stockholder in the corporation. In 1917 the petitioner held a promissory note for $10,000 made by one MacMillan which had been accepted as part payment on a piece of land in Winter Garden, Florida, which the corporation had sold to MacMillan. Before the note became due, MacMillan and Harry, who was the manager of petitioner's branch store in Winter Garden, approached the president of petitioner with the proposition that petitioner accept Harry's note in exchange for that of MacMillan. The proposition was accepted and the petitioner became the holder for good consideration of Harry's promissory note for $10,000 dated June 23, 1927, payable on demand, with interest from date at 8 per cent per annum. An interest payment was endorsed on this note in the amount of $1,542.46 through a credit to Harry's account, leaving a balance of interest due at June 23, 1929 of $57.54. Other than that no payments were made on the note and no accruals of interest were made on petitioner's books. Hoyle Pounds of Winter Garden, Florida, owner of the Pounds Motor Company, a Ford dealer, had sold automobiles, trucks, tractors, etc., to Harry. Hoyle Pounds and Pounds Motor Company maintained *229 charge accounts with petitioner's branch store in Winter Garden. The ledger account receivable maintained for Hoyle Pounds by the petitioner showed a balance of $612.98 on September 1, 1930. There were 35 charges to this account subsequent to September 1, 1930, and one credit of $20.62 on June 13, 1931. No entries occurred after February 28, 1935, when a balance of $808.08 was transferred to the Orlando store, due to the closing of the Winter Garden store. The ledger account receivable for Pounds Motor Company showed a balance of $3,125.14 on March 1, 1930. There were 41 charges subsequent to March 1, 1930, and one credit of $816.61 on June 30, 1931. No entries occurred after February 28, 1935, except two sets of offsetting entries arising from erroneous charges and correcting credits. The balance of $2,714 on February 28, 1935, was transferred to the Orlando store and remained unchanged until charged off on June 30, 1941. When petitioner pressed collection of the accounts owed by Pounds and Pounds Motor Company, Pounds complained that Harry owed him a lot more than Pounds owed the store, and threatened bankruptcy if the assumption of these accounts by Harry was not recognized. *230 This matter was discussed with Harry and he agreed orally to undertake these accounts, assuming these payments against what he owed Pounds. The ledger accounts showing the Hoyle Pounds and Pounds Motor Company debts were continued in those names until charged off in the fiscal year 1941 in which Harry died. No effort was made to collect from Pounds and Pounds Motor Company after Harry agreed to assume the debts. No payments were ever made by Harry on either the Pounds or Pounds Motor Company accounts. Dr. E. J. Lawrence of Winter Garden had been Harry's family physician in that town. Dr. Lawrence maintained a charge account with petitioner's branch store in Winter Garden. It was the practice between Dr. Lawrence and Harry to switch accounts, Harry paying on Dr. Lawrence's account with the petitioner instead of paying Dr. Lawrence. The only charges to this account subsequent to May 1, 1928, when the account balance was $1,172.41, were unexplained charges of 75 cents on March 5, 1934 and $1 on February 28, 1935. No cash payments were made on the account after December 21, 1932. On February 28, 1935, the balance of $663.57 in this account was transferred to the Orlando store. For June 5, 1935, there *231 was a credit of $100, with the explanation "By 1 pony sold Chas. Bumby." After June 5, 1935, there were no entries in the account until it was charged off June 30, 1941. A judgment was finally entered in favor of petitioner against Dr. Lawrence, the amount of which was stated by Harry to be the existing amount which he owed Dr. Lawrence, and actually to be his obligation under his verbal arrangement with Dr. Lawrence, but no written agreement to assume the indebtedness was ever executed by Harry. An account was carried by petitioner in Harry's name, to which merchandise purchased and cash withdrawals made by him were charged and his salary was credited. This account shows debit balances as follows: December 31, 1931
$1,042.22
December 31, 1932
658.64
December 30, 1933
532.06
December 31, 1934
814.25
December 30, 1935
1,207.32
No further entries occurred in the account after January 31, 1936, when the balance was $1,212.30, until June 30, 1941, when $50.85 was charged to the account with the explanation "customer ledger" and the balance of $1,263.17 charged off to profit and loss. At some time previous to 1932 Harry had become indebted in connection with *232 the purchase of various pieces of real estate and a farm. By 1932 he had lost all of these properties, the majority being acquired by various mortgage holders. A number of judgments had been entered against him including a default judgment of $11,828.30 entered July 25, 1932. When these judgments were coming up he transferred his stock in the petitioner to his wife, this transfer having been made on the books of the corporation on or about October 18, 1932. Subsequent to that Harry had no assets except his home, which was mortgaged. His financial condition remained substantially the same until his death in 1941. Previous to July 30, 1932, Harry had received a salary from the petitioner of $275 per month. From July 30, 1932 until 1939 his salary was $200 per month. In 1939 he was placed on a commission with a base salary. On this basis for the year prior to his death his compensation was about $1,700. He worked until the day before he died. From 1932 until the time of his death on April 11, 1941, Harry's salary was all he had to live on. He was considered a good salesman. During the period 1929 through 1941 business generally, and the hardware business particularly, was poor in *233 this section. Petitioner was one of the few such businesses in Florida that continued in operation without compromise settlement with creditors. It managed to exist through cutting expenses to the bone and paying very low salaries. Until 1939, when he went on a commission basis, none of the executives had received greater compensation than Harry. When Harry died he had an estate of less than $1,000. Subsequent to his death the president of the petitioner attempted unsuccessfully to persuade Ella Bumby, Harry's wife, that she should turn in the stock in the petitioner corporation which she had received from her husband, against his debt to the petitioner. For the fiscal year ended June 30, 1941, the petitioner on its return claimed a deduction of $15,348.82 as a debt owing from Harry Bumby, which became worthless in that year. The respondent in determining the deficiency herein disallowed the deduction so claimed. Such indebtedness as was due and owing by Harry Bumby to petitioner became worthless prior to the beginning of the fiscal year ended June 30, 1941. Issue No. 2. Finley Bros., Inc. In March 1939, Finley Bros., Inc., was set up as a sub-dealer or distributor of Dupont *234 paints. It thereby ran up a sizable account with the petitioner, some of it on about a six months basis. By the time the account was due, the petitioner saw that collection might be difficult and stopped selling. The collection efforts continued on this account over a period of several months and resulted in receipts against the account through April 1940, the last such payment being in the amount of $200. These efforts by the petitioner consisted of personal contact by its credit manager and collector. The Finley Brothers store was only two blocks from the petitioner's store and the efforts at collection were persistent and numerous, and elicited continuing promises to pay in the future. It was apparent, however, that the debtor was in financial difficulties and that its stock was being depleted although it continued to operate for some time by paying cash for everything. On July 18, 1941, a default judgment was entered in the Circuit Court of Orange County, Florida, against Finley Bros., Inc., in favor of Benjamin Moore & Company in the principal sum of $2,030.96, interest of $145.22 and $9.35 in costs. This judgment was recorded as a lien on August 18, 1941. Finley Bros., Inc. *235 , continued in business for a period of three or four years finally just dying out. It had no credit for about a year before it closed down completely. For the fiscal year ended June 30, 1942, the petitioner on its return claimed a deduction of $2,886.52 as a debt owing from Finley Bros., Inc., which became worthless in that year. The respondent in determining the deficiency herein disallowed the deduction so claimed. The indebtedness owing by Finley Bros., Inc., to petitioner became worthless in the fiscal year ended June 30, 1942. Opinion The issues remaining are the petitioner's claims of deduction for bad debts, $15,348.82 as the debt of Harry Bumby, alleged to have become worthless in the fiscal year ended June 30, 1941, and $2,886.52 as the debt of Finley Bros., Inc., alleged to have become worthless in the fiscal year ended June 30, 1942. The questions are accordingly questions of fact and the burden of proof with respect thereto is on the petitioner. On the carrying of that burden depends the petitioner's right to the benefit of operating net losses for those years in determining the deficiencies herein. Aside from such questions as suggest themselves as to whether *236 the indebtedness which originated against Hoyle Pounds, Pounds Motor Company and Dr. E. J. Lawrence may properly be considered as the indebtedness of Harry Bumby, the only question for decision is as to the year or years in which the indebtedness of Harry Bumby and Finley Bros., Inc., became worthless. That they did become worthless at some time appears to be an accepted fact. As to the years in which they became worthless, particularly the debt of Harry Bumby, there are various imponderables and, on the record before us, it is not possible to determine with any nicety or with satisfactory exactness the issues with respect thereto. If the inability of the petitioner to reach the shares of its stock which Harry Bumby transferred to his wife in 1932 be accepted, there seems to be no question that the debt of Harry Bumby to petitioner was worthless at and after his death in April of 1941; and if it be said that the continuation of Harry Bumby's life up to that time and, so long as his life continued, the bare possibility of some earnings which might be taken or received and applied to the debt was sufficient to preserve substance in petitioner's claim, it would, of course, follow that *237 the debt became worthless at and by reason of his death, and the petitioner should be sustained. On the other hand, if the history of the indebtedness, the attitude and acts of the parties with respect thereto, and the financial state and prospects of Harry Bumby for some ten or more years preceding his death are indicative of the value or substance in petitioner's claim against him, there is no question, we think, but that such indebtedness as did exist became worthless long prior to the fiscal year in which Harry Bumby died. It is to be noted that, even though petitioner is a corporation, it is a family corporation, all of the stock of which was owned by the brothers and sisters of Harry Bumby, and by Harry Bumby up to 1932, when he transferred his shares to his wife, and unless the failure to press collection of the indebtedness was for family reasons, rather than arm's-length business reasons, the picture here most persuasively indicates that on a common sense and practical basis, the indebtedness had been worthless for many years prior to Harry Bumby's death. Harry Bumby had owed petitioner $10,000 on the MacMillan note since 1927. Not only had he made no payments on the note, *238 but he had been delinquent as to interest since 1929. His earnings had not exceeded $200 a month since June 30, 1932, and prior to his death his compensation arrangement had been further cut back, to place him on a commission basis, and his total compensation for the year prior to his death was only $1,700. In addition, from 1932 to January 31, 1936, his indebtedness to petitioner, through overdrafts and charges, had increased by $1,212.30. Certainly at and prior to the date of his death, there is nothing in that picture which would indicate any prospects for improvement in his financial outlook. To the contrary, his financial position had worsened, and over that period from July 1932, to the date of his death, no payments had been made by him on the amounts owing to petitioner. Certainly on an arm's-length basis such picture would normally indicate worthlessness of the indebtedness, unless, for whatever effect it might have, we should conclude that there was an element of forbearance or forgiveness, by reason of the family relationship between Harry Bumby and the petitioner's stockholders. In addition to the picture presented as between Harry Bumby and petitioner for the eight to *239 ten years preceding his death, however, there is a further indication, we think, that the indebtedness of Harry Bumby was worthless long prior to his death. By July 25, 1932, a number of judgments had been entered against him by outside parties. We are advised as to only one of those judgments, which was entered on July 25, 1932, and was in the amount of $11,828.30. It was the entry of these judgments which had occasioned the transfer by Harry Bumby of his stock in petitioner to his wife and from that time on, he had no assets except his home, which was under mortgage. We have no information as to whether these judgments were kept alive, but we have no reason to assume that they were not. And so far as appears, they would have priority over the claims of petitioner to any property or funds which Harry Bumby might have or accumulate. There is no showing or suggestion that the holders of the judgments were ever at any time able to make any collections thereon. Such being the picture presented, we think that from the practical and common sense viewpoint the evidence preponderates in favor of the conclusion that any debt owing by Harry Bumby to petitioner was worthless prior to petitioner's *240 fiscal year ended June 30, 1941, and we have so found as a fact. With respect to the debt of Finley Bros., Inc., we think that from a common sense and practical standpoint the evidence preponderates in favor of the petitioner. Finley Bros., Inc., had been set up as a sub-dealer or distributor of Dupont paints in March of 1939. Within six months or a year, it was apparent that it was encountering difficulties in establishing and operating its business. It was not closed out, however, and petitioner did not wholly cease to do business with it, and even though continued efforts of petitioner at collection of the indebtedness resulted only in the collection of some $200, the petitioner did continue to furnish paint on a cash basis. As time passed it became apparent that the company was, in effect, merely liquidating its inventories and after some three or four years of operation the business "simply died out." On July 25, 1941, a judgment was entered in the Circuit Court of Orange County, Florida, against Finley Bros., Inc., and in favor of Benjamin Moore & Company, in the principal sum of $2,030.96, interest of $145.22 and $9.35 in costs. This judgment became a recorded lien on August 18, 1941. That *241 date was in the petitioner's fiscal year ended June 30, 1942, the year in which petitioner concluded that the debt of Finley Bros., Inc., had become worthless and the year for which the deduction herein was claimed. As in the case of the debt of Harry Bumby, a determination of the date of worthlessness of the Finley Brothers debt may not be made with nicety or satisfactory exactness. It is our opinion, however, as stated above, that the evidence preponderates in favor of the petitioner. We have accordingly concluded and found that the debt did become worthless in the fiscal year ended June 30, 1942, as claimed by petitioner. Decision will be entered under Rule 50.